# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MILTON CACERES MOLINA<br>a/k/a/ MILTON CANALES MOLINA,<br><br>    *Plaintiff*,<br><br>        v.<br><br>WILLIAM JOYCE, in his official capacity as the Acting Field Office Director for the New York Field Office, U.S. Immigration & Customs Enforcement; TODD LYONS, in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations, ICE; KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security; PAMELA BONDI, in her official capacity as Attorney General of the United States,<br><br>    *Defendants*. | **Case No. 25-cv-1844**<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1.      Plaintiff Milton Caceres Molina[1] ("Mr. Caceres" or "Plaintiff") has been subject to mandatory immigration detention without a bond hearing for three years—even after an Immigration Judge ("IJ") granted him relief based on the likelihood that he will be tortured if deported.

2.      Mr. Caceres is a 34-year-old man from El Salvador who suffered years of violent attacks by rival gangs, each of which falsely accused him of membership in the other. After several years of fighting to prevent his removal from the United States, Mr. Caceres finally won protection under the Convention Against Torture ("CAT") in light of the likelihood that the Salvadoran government, which has also falsely accused him of participating in gang activities, will incarcerate him and subject him to torture.

3.      Because of the posture of his immigration proceedings—known as "withholding only" proceedings—Mr. Caceres is subject to mandatory detention without a bond hearing pursuant to 8 U.S.C. § 1231(a)(6). Although there is no statutory right to a bond hearing, the Constitution forbids Mr. Caceres' detention from continuing indefinitely or without review by a neutral adjudicator. Mr. Caceres' detention for three years without a bond hearing has clearly become unreasonably prolonged in violation of due process.

4.      ICE's continued detention of Mr. Caceres following the grant of his claim for protection by the immigration judge also violates its own policies, which favor releasing people like Mr. Caceres who have been granted fear-based immigration relief.

---

[1] Due to an administrative error, Mr. Caceres Molina's name appears as "Milton Canales Molina" throughout agency records. However, "Caceres Molina" is Plaintiff's legal name.

5.      Mr. Caceres brings this action under the Due Process Clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 706(2), to compel Defendants to provide him a constitutionally adequate bond hearing at which the government bears the burden to justify his continued detention by clear and convincing evidence and to hold unlawful and set aside Defendants' decision denying Plaintiff's Release Request.

**PARTIES**

6.      Plaintiff Milton Caceres Molina is a 34 year-old man born in El Salvador who has been granted relief from deportation pursuant to the Convention Against Torture ("CAT"). In El Salvador, Mr. Caceres was subjected to years of violent harassment for his refusal to join Salvadoran gangs.  He is the father of two United States citizen children,  Mr. Caceres is detained in the custody of defendants at the Central Louisiana ICE Processing Center ("CLIPC") in Jena, Louisiana. He is detained under the authority of ICE's New York Field Office, which is in charge of his detention and decisions related to his release.

7.      Defendant William Joyce is named in his official capacity as the Acting Director of the New York Field Office for ICE within DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention determinations for noncitizens detained under the authority of the New York Field Office. As such, he is the custodian of Petitioner. Defendant Joyce's office is at 26 Federal Plaza, New York, New York 10278.

8.      Defendant Todd Lyons is ICE's Acting Executive Associate Director for Enforcement and Removal Operations within DHS. In this capacity, he is responsible for the administration of immigration laws and the detention and removal of noncitizens. He supervises

Defendant Joyce. Defendant Lyon's office is located in the U.S. Department of Homeland Security, Washington, DC 20528.

9.      Defendant Kristi Noem is named in her official capacity as the Secretary of DHS. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a); she routinely transacts business in the Southern District of New York; she supervises Defendants Joyce and Lyons; and she is legally responsible for Defendant's detention and removal. As such, she is a custodian of Petitioner. Defendant Noem's office is in the U.S. Department of Homeland Security, Washington, DC 20528.

10.     Defendant Pamela Bondi is named in her official capacity as the Attorney General of the United States. In this capacity, she is responsible for the administration of the immigration laws as exercised by the Executive Office for Immigration Review ("EOIR") pursuant to 8 U.S.C. § 1103(g). She routinely transacts business in the Southern District of New York and is legally responsible for administering Plaintiff's removal proceedings and the standards used in those proceedings. As such, she is a custodian of Petitioner. Defendant Bondi office is in the U.S. Department of Justice, 950 Pennsylvania Ave., Washington, DC 20530.

## JURISDICTION

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the matter in controversy arises under the Constitution of the United States and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

12.     The Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act.

## VENUE

13.    Venue is proper in the Southern District of New York under 28 U.S.C. § 13919(e)(1)(B). This is an action against officers and agencies of the United States acting in their official capacities. Defendant Joyce has his principal place of business at the New York Field Office of ICE's Enforcement and Removal Operations, which lies within this District at 26 Federal Plaza, New York, New York. A substantial part of the events giving rise to the claim occurred in the District. The New York Field Office, located within the District, is solely responsible for decisions regarding Plaintiff's custody, including the initial decision to take him into detention and the subsequent decision to continue detaining him. Furthermore, Plaintiff's immigration proceedings, including any bond proceedings, take place within the District at the Varick Street Immigration Court, located at 201 Varick Street, New York, New York.

## STATEMENT OF FACTS

### I.    Legal Background

#### A.    "Withholding-only" proceedings allow noncitizens with reinstated removal orders to seek withholding or deferral of removal.

14.    When a noncitizen facing persecution in their home country reenters the United States after having previously been removed, they are subject to a process called reinstatement of removal, whereby the government reinstates the noncitizen's prior removal order and seeks to immediately deport them without a hearing. 8 U.S.C. § 1231(a)(5).

15.    However, pursuant to treaty obligations codified into U.S. law prohibiting removal of individuals to countries where their lives are at risk, a noncitizen in reinstatement is entitled to a "reasonable fear interview" ("RFI") before they can be removed without a hearing. 8 C.F.R. § 241.8(e).

4

16.     To show a reasonable fear of persecution, the noncitizen must demonstrate "a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c).

17.     If an Asylum Officer ("AO"), the federal employee charged with conducting the interview, determines that the noncitizen has shown a reasonable possibility of persecution or torture, the noncitizen is referred for a proceeding before an Immigration Judge ("IJ") known as "withholding-only proceedings." This proceeding offers the noncitizen an opportunity to show eligibility for withholding or deferral of removal, forms of immigration relief based on fear of persecution or torture that remain available to noncitizens with reinstated removal orders. 8 C.F.R §§ 1208.16, 1208.17.

**B.      Noncitizens in withholding-only proceedings are subject to detention without a bond hearing pursuant to 8 U.S.C. § 1231(a)(6).**

18.     Noncitizens in withholding-only proceedings are subject to mandatory immigration detention without the right to a bond hearing pursuant to 8 U.S.C. § 1231(a)(6). *Johnson v. Guzman Chavez*, 594 U.S. 523, 533 (2021) (abrogating *Guerra v. Shanahan*, 831 F.3d 59, 64 (2d Cir. 2016)).

19.     8 U.S.C. § 1231(a)(6) applies to the detention of noncitizens who have been issued a final removal order. Section 1231(a)(1) establishes a 90-day "removal period" following the issuance of the removal order during which the noncitizen must be detained without a custody review before a neutral decision-maker. Section 1231(a)(6) states that certain noncitizens, including those in withholding-only proceedings, "may be detained beyond the removal period." The plain text of § 1231(a)(6) provides no limitation on the time "beyond the removal period" during which a noncitizen may be detained. Nor does the statute discuss the availability of any

mechanism for review that would enable noncitizens who remain detained pursuant to § 1231(a)(6) to seek release before a neutral adjudicator.

**C.    Regulations provide for non-neutral review by ICE of the custody of noncitizens detained pursuant to 8 U.S.C. § 1231(a)(6).**

20.    Instead of custody review before a neutral decision-maker, DHS regulations provide for only limited custody review before non-neutral officials from ICE—the agency that arrests, jails, and prosecutes noncitizens. 8 C.F.R. § 241.4.

21.    This "post-order custody review" ("POCR") process involves an initial custody determination within 90 days of detention. 8 C.F.R. § 241.4(k)(1)(i). That custody determination is conducted by a local ICE official, the Field Office Director of ICE Enforcement and Removal Operations ("ERO") which has authority over the custody of the noncitizen, and is based on a "records review" to determine whether release is appropriate. 8 C.F.R. §§ 241.4(c)(1), (h)(1), (h)(5). If an individual is detained beyond the initial 90-day period, a second administrative review of the individual's detention occurs around 180 days (or six months) of incarceration. 8 C.F.R. §§ 241.4(c)(2), (k)(2)(ii), (k)(2)(iv). The authority to conduct the 180-day review is transferred from the Field Office Director having jurisdiction over the detainee to ICE's Executive Associate Director for Enforcement and Removal, acting through a particular unit of ICE headquarters, the Headquarters Post-Order Detention Unit ("HQPDU"). *See* 8 C.F.R. §§ 241.4 (c)(2), (i), (k)(2).

22.    The review process entails few procedural safeguards. It begins with a records review, and, if release is not authorized after this records review, the detained individual is interviewed by a panel of ICE deportation officers. 8 C.F.R. § 241.4(i)(1)-(3). The panel asks a series of questions, records the individual's answers, and then prepares a recommendation on whether the individual should remain in custody, which is then passed to the ultimate decisionmaker—an officer at ICE's Washington, D.C. headquarters—who does not directly

interview or hear from the detained person or their representative. 8 C.F.R. § 241.4(c)(2), (i)(4)-(6).

23.    Although an attorney or representative is permitted to attend the interview, 8 C.F.R. § 241.4(d)(3), (i)(3), and an individual may submit evidence on their behalf, *id*. § 241.4(i)(3)(ii), there are no provisions authorizing presentation of argument, calling of witnesses, or viewing or confronting the government's evidence. *See generally* 8 C.F.R. § 241.4(i)(3) (describing the interview process).

24.    During the regulatory POCR process, the burden is on the noncitizen to demonstrate that they are neither a danger nor a flight risk. 8 C.F.R. § 241.4(d)(1). There is no right to appeal the agency's determination. 8 C.F.R. § 241.4(d), (g)(2). The ultimate decision to release is discretionary even if an individual establishes that his or her release does not pose a danger to the community or a significant flight risk. 8 C.F.R. § 241.4(d)(1).

25.    A subsequent review is only commenced by ICE "within approximately one year" of the 180-day review, after approximately 18 months of confinement. *See* 8 C.F.R. § 241.4(k)(2)(iii). A noncitizen may submit a written request once every three months between the annual reviews based on a "material change in circumstances," and ICE may take approximately 90 days—another three months—to respond. *Id*.

26.    In Mr. Caceres' case, upon information and belief, ICE did not provide the periodic POCR reviews required by the regulations.

**D.    ICE has a longstanding policy favoring release of noncitizens, like Plaintiff, granted withholding or deferral of removal under the Convention Against Torture.**

27.    In addition to these procedures for custody review, ICE has created a binding policy (the "Release Policy") favoring release of noncitizens granted withholding or deferral of removal.

The Release Policy applies to Plaintiff as he has been granted deferral of removal under the Convention Against Torture. *See* Ex. A, Release Policy.

28.    The Release Policy goes back 25 years. Longstanding guidance states that, "[if] an alien has been finally granted withholding or deferral of removal and the INS [ICE's predecessor agency] is not actively pursuing the alien's removal to an alternate country, the INS has the authority to consider the release of such an alien during the removal period . . . . The decision whether or not to release such an alien must take into consideration all appropriate factors, including whether the alien poses a threat to the community or flight risk." Memorandum from Bo Cooper, General Counsel, to Regional Counsel, Re: Detention and Release during the Removal Period of Aliens Granted Withholding or Deferral of Removal," Apr. 21, 2000.

29.    A 2004 agency directive further states that, "[i]n general, it is ICE policy to favor release of aliens who have granted protection relief by an immigration judge, absent exceptional concerns such as national security issues or danger to the community and absent any requirement under law to detain." ICE Directive 16004.1, Detention Policy Where an Immigration Judge has Granted Asylum and ICE has Appealed (Feb. 9, 2004).

30.    "In all cases, the Field Office Director must approve a decision to keep an alien granted protection relief in custody pending appeal, in consultation with the Chief Counsel." *Id*.

31.    In 2021, then-Acting ICE Director Tae Johnson clarified that ICE personnel must "continue to follow this Directive," emphasizing that release should occur even if the government was appealing a grant of fear-based relief. *See* Memorandum from Tae D. Johnson, Acting Director, to All ICE Employees, Re: Detention Policy Where an Immigration Judge has Granted Asylum, Withholding of Removal, or Convention Against Torture Protection, and DHS has Appealed (June 7, 2021).

32.     Acting Director Johnson further stated that "prior convictions alone do not necessarily indicate a public safety threat or danger to the community" and "the individual facts and circumstances of the case, including extensiveness, seriousness, and recency of the criminal activity, along with any evidence of rehabilitation, should be considered in making such determination [to release a noncitizen granted withholding of removal]." *Id*

## II.    Factual and Procedural History

### A.    Mr. Caceres fled to the United States twice because of incessant violent harassment by Salvadoran gangs, culminating on threats to his life.

33.     Mr. Carceres is a 34-year-old man from El Salvador who has lived in the United States for nearly half of his life and has been granted immigration relief based on the likelihood that he will be tortured in El Salvador. He has two U.S.-citizen daughters ages 8 and 13. When he was around 14 years old, in 2005, he first fled to the United States to escape forcible recruitment into the Salvadoran gangs that plagued the country. In the United States, he lived with family in Long Island, New York, and worked at various jobs, including in a greenhouse, to provide for himself and family.

34.     On November 7, 2009, Mr. Carceres was convicted of two misdemeanors in violation of N.Y. Penal Law § 265.01(1) and sentenced to time served with a fine. The charges arose from an incident at a bar in which Mr. Caceres found a firearm and attempted to give it to a security guard. Following the resolution of his criminal case, he was transferred to ICE custody. He was ultimately ordered removed and deported to El Salvador in 2010, where he remained until 2013.

35.     In the three years following his removal to El Salvador, both MS-13 and M-18 gang members subjected him to vicious attacks as each tried to forcibly recruit him and to pin him

against the other. Mr. Carceres' refusal to join either gang led them to inflict increasing violence on him.

36.     In early 2012, Mr. Caceres was attacked at knifepoint by members of the M-18 while riding a bus home from work. After being forced off the bus, he found himself surrounded by additional M-18 members, who accused him of being an MS-13 member. They stabbed him in his hands and once in his leg before he managed to run off to safety. He decided not to file a police report out of fear that the police would inform gangs about the report.

37.     Later that year, Mr. Caceres was arrested and beaten by police officers who repeatedly asked him why he refused to join MS-13. In El Salvador, state authorities, including police, have collaborated with gangs and participated in harming people who have refused to join them. The police charged Mr. Caceres with illegal possession of a weapon. Even though the allegation was false, Mr. Carceres pled guilty in order to secure his release from jail. Mr. Caceres was sentenced to three years of probation.

38.     After his release from custody, Mr. Caceres continued to be the target of gang violence. In June 2013, he was dragged off a bus and beaten by MS-13 members and several police officers, who took him to a secluded location in the mountains, beat him unconscious, and tortured him for over 12 hours. Left for dead, Mr. Caceres was taken to the hospital by passers-by. Hospital staff then called the police. By the time they arrived, Mr. Caceres had regained consciousness. He recognized the two officers who visited him as two of the individuals who had attacked and kidnapped him. After the doctor left the room, the officers warned Mr. Caceres that if he followed through with a police report, he and his family would be killed.

39.     Mr. Carceres' persecution by gangs with the active participation of the state is consistent with country conditions in El Salvador, where corruption is widespread and impunity persists for those who abuse the system. This left Mr. Carceres with no choice but to leave the country for his safety.

**B.    After returning to the United States, Mr. Caceres was later placed in removal proceedings and, after four years of challenging his removal, was granted relief in light of the likelihood that he will be tortured in El Salvador.**

40.     Following his hospitalization, Mr. Carceres fled to the United States again in 2013. Mr. Caceres entered the United States without inspection and reunited with his family in Long Island, New York.

41.     Mr. Caceres lived and worked in the United States for the next nine years. He became a father to his second U.S.-citizen daughter, and lived with his mother, stepfather, and brothers, all of whom have lawful status in the United States. He worked in roofing and siding for several years before his second detention by ICE.

42.     During this time, Mr. Caceres' sole contact with the criminal justice system was a 2019 driving infraction. On November 16, 2019, he pleaded guilty to violating N.Y. Veh. & Traf. Law § 511-A(I), and was sentenced to a $200 fine.

43.     In September 2021, Mr. Carceres was arrested for violating 8 U.S.C. § 1326(a), illegal reentry, and prosecuted in the Eastern District of New York.

44.     At that time, Mr. Caceres learned that prosecutors in El Salvador had falsely accused him of membership in M-18 and participation in serious crimes, including participating in a phone call in which a murder was discussed, and had issued a warrant for his arrest. Mr. Caceres also learned that there was an Interpol Red Notice for his arrest based on the Salvadoran charges. The accusations against Mr. Caceres arose only after he left El Salvador. The basis for the

allegation that he had been present on the phone during a call in which a murder was discussed was information provided by sole witness who claimed to identify over a dozen people participating in the call. There is no evidence to support the charge, which is false. Mr. Caceres submitted ample evidence in his immigration proceedings demonstrating that he never joined a gang.

45.     Mr. Caceres pleaded guilty to illegal reentry and was sentenced to time served in or around February 2022.

46.     At the time of his release from criminal custody for the reentry charge, Mr. Carceres was transferred to ICE custody and detained in Orange County Jail in New York from February 2022 to July 2022. While detained, Mr. Caceres expressed his fear of return to El Salvador and was provided a reasonable fear interview ("RFI"). DHS concluded that he had a reasonable fear of torture in El Salvador. He was thus served with a Form I-871 Notice of Intent to Reinstate Prior Removal Order and placed in "withholding-only" proceedings at the Varick Street Immigration Court in New York City.

47.     On July 18, 2022, the Immigration Judge ("IJ") denied Mr. Caceres' applications for withholding of removal and protection under the Convention Against Torture ("CAT"). Mr. Caceres filed an appeal, which the Board of Immigration Appeals ("BIA") dismissed on November 8, 2022. He then filed a petition for review before the Court of Appeals for the Second Circuit.

48.     While his appeal was pending, the BIA reopened Mr. Caceres' immigration proceedings on February 2, 2024 based on "changed conditions—in which El Salvador's March 2022 'State of Exception' pertaining to suspected gang members has been dramatically expanded in scope and apparent permanence—[that] are material to his eligibility for CAT protection and, indeed, sufficient to establish his prima facie eligibility for such protection when viewed in conjunction with the evidence already of record." Ex. B. BIA Remand.

49.     Following remand of his immigration proceedings, the IJ granted Mr. Carceres'
application for deferral of removal under the CAT on September 3, 2024. The IJ concluded that it
was more likely than not that Mr. Caceres would be tortured in El Salvador in light of the State of
Exception and the two outstanding arrest warrants against him. The IJ noted specifically that the
outstanding charges placed Mr. Carceres squarely within the crosshairs of the State of Exception,
which targets individuals suspected of belonging to a gang. The IJ also found that Mr. Caceres had
testified credibly and persuasively regarding the acts of violence committed against him by gang
members in El Salvador. The IJ similarly credited the expert testimony of country conditions expert
Dr. Tommie Sue Montgomery, who stated there was a "100 percent certainty" that Mr. Caceres
would be incarcerated and held without due process and in conditions amounting to torture if
deported to El Salvador. Relying on evidence from Dr. Montgomery and country conditions in the
record, the IJ concluded that Mr. Caceres would be subjected to torture in the form of prolonged
detention, acts of torture inflicted by prison guards and the police, and life-threatening conditions
that typify Salvadoran jails under the State of Exception.

50.     On September 5, 2024, DHS appealed the IJ's grant of relief to Mr. Caceres. The
appeal was fully briefed by the parties as of January 24, 2025, and remains pending before the
BIA.

**C.      Throughout his removal proceedings, Mr. Caceres has been detained in jail-like conditions in which he has experienced medical neglect.**

51.     Mr. Caceres has remained detained in jail-like conditions throughout the duration
of his immigration proceedings.

52.     Following his detention at the Orange County Jail in February 2022, ICE
transferred Mr. Caceres to the Adams County Correctional Center in Natchez, Mississippi in July

2022. Mr. Caceres was then transferred to the Central Louisiana ICE Processing Center ("CLIPC") in Jena, Louisiana sometime in 2023. He remains detained at CLIPC.

53.    At CLIPC, like the facilities he was held previously, Mr. Caceres is detained in conditions equivalent to criminal incarceration in a jail or prison. CLIPC originally opened as a juvenile prison in 1998 before the Department of Justice sued its private operator for using excessive force against and failing to protect detained juveniles.[2] The facility was briefly reopened in 2005 to house incarcerated people displaced due to Hurricane Katrina and again was subject to complaints of mistreatment and abuse.[3]

54.    Since its conversion to an immigration detention center, CLIPC has regularly been subject to complaints regarding abuse of detainees. A 2017 report revealed that CLIPC was among the top five ICE detention facilities with the most complaints of sexual assault.[4] The facility has most recently been subject to complaints of medical neglect related to the deaths of several detainees. *See, e.g.*, Bobbi-Jean Misick, *New complaint alleges sex assault, medical neglect, abuse of detainee at Louisiana ICE facility*, WWNO – New Orleans Public Radio (Apr. 10, 2023), https://www.wwno.org/immigration/2023-04-10/new-complaint-alleges-sex-assault-medical-neglect-abuse-of-detainee-at-louisiana-ice-facility; Bobbi-Jean Misick, *Recently unearthed report raises concerns about suicide prevention at Louisiana immigration center*, Louisiana Illuminator (Sept. 27, 2023), https://lailluminator.com/2023/09/27/suicide-immigration-center/; *Immigrant who died in Louisiana ICE detention center had filed at least 29 grievances*, Bobbi-Jean Misick,

---

[2] *See, e.g.*, Press Release, U.S. Department of Justice, Justice Department Sues, Files for Emergency Relief to Protect Juveniles in Louisiana's Jena Juvenile Justice Center (March 30, 2000), https://www.justice.gov/archive/opa/pr/2000/March/155cr.htm.
[3] *See, e.g.*, Human Rights Watch, Louisiana: After Katrina, Inmates Face Prison Abuse (Oct. 2, 2005), https://www.hrw.org/news/2005/10/02/louisiana-after-katrina-inmates-face-prison-abuse.
[4] *See* Adolfo Flores, *Few Complaints Of Sexual Abuse Inside Immigrant Detention Centers Are Investigated, Report Finds*, BuzzFeed News (Apr. 11, 2017), https://www.buzzfeednews.com/article/adolfoflores/sexual-assault-complaints-at-detention-centers#.

Louisiana Illuminator (July 13, 2023), https://lailluminator.com/2023/07/13/immigrant-who-died-in-louisiana-ice-detention-center-had-filed-at-least-29-grievances/; Notice of Claim for Damages Under the Federal Tort Claims Act Re: Daniel Cortes de la Valle (Dec. 10, 2024), https://rfkhumanrights.org/our-voices/complaint-exposes-torture-and-cruel-and-degrading-treatment-at-louisiana-immigration-detention-center/ (describing "months of life-threatening medical neglect, physical abuse, verbal threats, placement in solitary confinement, and retaliation" suffered by detainee with a seizure condition).

55.    Consistent with these reports, CLIPC has denied Mr. Caceres medical treatment for a knee injury that jail staff caused in November 2023. Following the use of physical force by a jail guard who threw Mr. Caceres to the ground, CLIPC placed Mr. Caceres in solitary confinement for over 30 days, during which time the jail failed to provide treatment for his knee injury despite repeated requests by his attorney. For several months, Mr. Caceres continued to experience pain, numbness, and limited movement in his right knee. On May 2, 2024, Mr. Caceres was taken to see an orthopedic surgeon, who recommended that he receive an MRI within 4 weeks. ICE did not comply with the surgeon's recommendation and did not provide Mr. Caceres appropriate treatment.

56.    On November 22, 2023, Mr. Caceres' counsel filed a complaint with DHS' Office for Civil Rights and Civil Liberties ("CRCL"), which is tasked with investigating violations of binding standards in ICE detention and issuing appropriate recommendations. Mr. Caceres alerted CRCL the use of excessive force against him and to his placement in solitary confinement without medical care. Following an investigation of the complaint, CRCL recommended that "ICE provide additional training on accurately reporting use of force incidents, including documenting all recording devices used in these incidents." *See* Ex. C. CRCL Recommendation.

**D.     ICE has failed to regularly review Mr. Caceres' detention or to apply its policy favoring release for people granted fear-based relief.**

57.     ICE has failed to comply with its obligation to regularly review Mr. Caceres' custody. On information and belief, ICE did not conduct the 180-day review required by 8 C.F.R. § 241.4(k)(2)(ii) or the subsequent custody review envisioned by 8 C.F.R. § 241.4(k)(2)(iii).

58.     ICE only conducted a custody review for Mr. Caceres in response to a release request filed on October 31, 2024 on his behalf by his counsel at Brooklyn Defender Services following his grant of relief under CAT. Even then, however, ICE failed to comply with its policy favoring release of noncitizens detained pursuant to § 1231(a)(6) who have been granted withholding or deferral of removal.

59.     Mr. Caceres' October 31, 2024 release request, submitted to ERO, explained that: (1) based on ICE's policy favoring release of noncitizens granted withholding of removal or protection under CAT, he should be released absent exceptional concerns; (2) he is not a danger to the community or national security risk; and (3) he is not a flight risk. Mr. Caceres further urged ICE to conduct its mandatory custody reviews applicable to individuals in post-order 8 U.S.C. § 1231 detention.

60.     A month later, Mr. Carceres received a denial of his release request from the Director of ERO's New York Field Office bearing the signature bloc of Kenneth Genalo, but electronically signed by William Joyce. *See* Ex. D. On information and belief, Mr. Joyce was the Field Office Director at the time.

61.     The decision does not reference the POCR regulations. It also does not appear to comply with the POCR regulations for custody reviews after 180 days, as the decision is in the

first person singular and is not signed by ICE's Executive Associate Director for Enforcement or Removal or by any member of HQPDU.

62.     The denial furthermore addressed neither ICE's policy in favor of releasing people in Mr. Caceres' position nor ICE's failure to comply with the POCR regulations. The denial instead cited the standards applicable to discretionary releases on humanitarian parole under 8 U.S.C. § 1182(d)(5) (which are not applicable here) that release be for humanitarian reasons or a significant public benefit.[5] ICE did not address the substantial supporting evidence Mr. Caceres submitted on his behalf. ICE provided no explanation for its departure from its policy favoring release for noncitizens like Mr. Caceres who have been granted withholding or deferral of removal.

63.     There is no substantial likelihood that Mr. Caceres will be removed in the foreseeable future. Mr. Caceres has already won immigration relief upon a thorough showing that it is more likely than not that he would be tortured in El Salvador, including ample evidence that people similarly situated to Mr. Caceres have experienced torture under El Salvador's ongoing State of Exception.

64.     Whatever the outcome of DHS' appeal of this grant, Mr. Caceres' removal is unlikely in the foreseeable future. Briefing in DHS' appeal was only complete as of January 24, 2025. The appeal will likely remain pending for several months. If the BIA grants the appeal, the

---

[5] *Compare* Release Request Denial ("The release of an individual from detention is generally justified **only on a case-by-case basis for humanitarian reasons or significant public benefit**.") (emphasis added) *with* 8 U.S.C. § 1182(d)(5)(A) ("The Secretary of Homeland security may . . . in his discretion parole into the United States [a noncitizen applying for admission] temporarily under such conditions as he may prescribe **only on a case-by-case basis for urgent humanitarian reasons or significant public benefit**.") (emphasis added).  Parole under 8 U.S.C. § 1182(d)(5)(A) is only available to individuals who are applicants for admission and detained under 8 U.S.C. § 1225; it is not available to individuals like Petitioner detained under 8 U.S.C. § 1231. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018).

case will be remanded for further proceedings before the Immigration Court, which would take months, if not years, and after which the parties would again have the opportunity to appeal. If the BIA dismisses the appeal Mr. Caceres' deferral of removal would become final. He could no longer be deported to El Salvador.,

65.     As of the date of this filing, Mr. Carceres has been detained in ICE custody without ever being provided a bond hearing for 37 months.

## CLAIMS FOR RELIEF

### COUNT ONE
**Unreasonable Detention Without a Bond Hearing**
*Due Process Clause of the Fifth Amendment of the United States Constitution*

66.      Plaintiff realleges and incorporates by references paragraphs 1 through 65.

67.     Defendants' failure to afford Plaintiff a bond hearing at which the government must prove by clear and convincing evidence that Plaintiff's detention is necessary to prevent danger to the public or risk of flight violates the Due Process Clause of the Fifth Amendment of the United States Constitution.

68.     Due process demands "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas v Davis*, 533 U.S. 678, 690 (2001). Moreover, the only constitutionally permissible grounds for civil immigration detention are ensuring appearance at future immigration proceedings and preventing danger to the community. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 531 (2003).

69.     Courts in the Second Circuit evaluate the reasonableness of prolonged immigration detention using the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Black v. Decker*, 103 F.4th 133, 148-50 (2d Cir. 2024) (detention pursuant to 8 U.S.C. § 1226(c)); *Velasco*

*Lopez v. Decker*, 978 F.2d 842, 851 (2d Cir. 2020) (detention pursuant to 8 U.S.C. § 1226(a));

*Cabrera Galdamez*, 2023 WL 1777310, at *4 (detention pursuant to 8 U.S.C. § 1231(a)(6)).

70.    Each *Mathews* factor weighs in favor of concluding that Mr. Caceres' detention

without a bond hearing has become unreasonably prolonged.

71.    *First*, Mr. Caceres' private interest "is the most significant liberty interest there is –

the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. He has been

detained for approximately 37 months, "a period significantly longer than the presumptively

reasonable period of six months contemplated in *Zadvydas* and radically longer than the 'standard'

90-day removal period laid out in § 1231." *Cabrera Galdamez*, 2023 WL 1777310, at *5.

72.    *Second*, Mr. Caceres faces a high risk of erroneous deprivation because ICE's

internal reviews—which the agency failed to conduct in any event—do not take place before a

neutral adjudicator and place the burden of proof on the detained noncitizen. *See Cabrera

Galdamez*, 2023 WL 1777310 at *6.

73.    *Third*, the government's interest in continuing Mr. Caceres' already prolonged

detention without even affording the opportunity to be heard at a bond hearing is minimal,

particularly as Mr. Caceres has already been granted fear-based relief from removal. *See, e.g.*,

*Velasco Lopez*, 978 F.3d at 854-55 (finding that a bond hearing to determine the appropriateness

of continued detention "promotes the Government's interest . . . in minimizing the enormous

impact of incarceration in cases where it serves no purpose" and does not substantially undermine

its legitimate interests or entail an undue administrative burden.). To justify the necessity of civil

detention, due process further requires that the jailer be held to a heightened standard of proof—

specifically to a standard of clear and convincing evidence. *See, e.g.*, *Velasco Lopez*,  978 F.3d at

855-56; *Cabrera-Galdamez*, 2023 WL 1777310, at *8-9. In setting bond, the Immigration Court

must also consider the availability of alternatives to detention and ability to pay with respect to both dangerousness and flight risk. *Cabrera-Galdamez*, 2023 WL 1777310, at *9.

74.     Plaintiffs' detention for 37 months without a bond hearing before a neutral decision-maker violates due process.

**COUNT TWO**
**Violation of *Accardi* Doctrine**
***Administrative Procedure Act*, 5 U.S.C. § 706(2)**

75.     Plaintiff realleges and incorporates by references paragraphs 1 through 65.

76.     The Administrative Procedure Act allows courts to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2).

77.     Agencies are liable under the Administrative Procedure Act for failing to comply with rules that have the force and effect of law. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954).

78.     A rule has the force of law where it binds the agency and affects the rights of individuals, whether or not the rule is more rigorous than would otherwise be required and whether or not it has been published in the Federal Register. *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991).

79.     Where a noncitizen remains detained pursuant to 8 U.S.C. § 1231(a)(6) beyond three months after the expiration of their removal period, regulations mandate that the official responsible for reviewing their custody is ICE's Executive Associate Commissioner for Enforcement and Removal, acting through HQPDU. 8 C.F.R. §§ 241.4 (c)(2), (i), (k)(2).

80.    ICE's Release Policy, implemented by Directive 16004.1 and related agency guidance, further creates a presumption in favor of releasing individuals detained pursuant to 8 U.S.C. § 1231(a)(6) who have been granted fear-based relief, absent exceptional circumstances.

81.    The Release Policy pertains to individual rights and has a binding effect on the agency.

82.    ICE's denial of Plaintiff's release request did not conform to 8 C.F.R. §§ 241.4 (c)(2), (i), (k)(2) or to the Release Policy.

83.    ICE's Executive Associate Director, acting through HQPDU, did not adjudicate the release request as required by the POCR regulations.

84.    The Field Officer Director who adjudicated the release did not apply the presumption in favor of release of noncitizens granted fear-based relief, as required by the Release Policy, and instead considered irrelevant factors under an inapplicable statutory standard.

85.    ICE's denial violates the APA because it is therefore arbitrary, capricious, and an abuse of discretion and was made without observance of procedure required by law.


WHEREFORE, Plaintiff prays that this Court grant the following relief:

1) Assume jurisdiction over this matter;

2) Order that, within seven days of this Court's order, Defendants must comply with the Due Process Clause by holding a bond hearing at which the Government must prove, by clear and convincing evidence, that Plaintiff presents a future danger to the community or a risk of flight that cannot be mitigated by an alternative to detention or reasonable bond, and that the Immigration Court shall have the ongoing ability to consider changed circumstances and modify any conditions initially set;

3) Hold unlawful and set aside Defendants' decision denying Plaintiff's Release Request on the ground that it is arbitrary, capricious, and an abuse of discretion and was made without observance of procedure required by law;

4) Award Plaintiff his costs and reasonable attorneys' fees in this action as

provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or other statute; and

5) Grant any other and further relief that this Court deems just and proper.


Dated:          March 5, 2025            Respectfully submitted,
                New York, NY

                                          */s/ Kevin Siegel*
                                          Kevin Siegel, Esq.
                                          Brooklyn Defender Services
                                          177 Livingston Street, Floor 7
                                          Brooklyn, NY 11201
                                          Tel: 718-254-0700
                                          Email: ksiegel@bds.org

                                          *Counsel for Petitioner*