UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MILTON CACERES MOLINA a/k/a MILTON CANALES MOLINA,

Plaintiff,

-against-                                                          25-cv-1844 (LAK)

WILLIAM JOYCE, etc., et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/1/2026___

### MEMORANDUM OPINION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Appearances:

Lucas S. Marquez
Alyssa Briody
BROOKLYN DEFENDER SERVICES
*Attorneys for Plaintiff*

Allison M. Rovner
Assistant United States Attorney
JAY CLAYTON
UNITED STATES ATTORNEY
*Attorney for Defendant*s

LEWIS A. KAPLAN, *District Judge*.

Plaintiff Milton Caceres Molina – a noncitizen who has been granted protection against removal to his native country of El Salvador due to a likelihood of facing torture there – has been detained by U.S. Immigration and Customs Enforcement ("ICE") since February 11, 2022. For

2

the four years and almost five months in which he has been detained while purportedly awaiting removal, Caceres never has been able to obtain review of his detention by anyone other than ICE. Defendants – various ICE and other government officials (collectively, the "Government")[1] – say that this simply is a lawful byproduct of immigration statutes and regulations. Caceres, meanwhile, claims that his ongoing detention violates both due process and ICE's own policies. The matter is before the Court on cross-motions for summary judgment.

***Facts***

*I.    Plaintiff's Immigration History*

Caceres is a citizen of El Salvador.[2] He is thirty-five years old and the father to two young children, both of whom are U.S. citizens.[3] He first illegally entered the United States in 2005, when he was around fourteen years old, to escape forcible recruitment into a gang in El Salvador.[4]

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), the successors to original-defendants William Joyce, Todd Lyons, Kristi Noem, and Pamela Jo Bondi are automatically substituted as defendants. For purposes of resolving these motions, however, it suffices to identify defendants as only the Government.

[2]     Morrow Second Suppl. Decl. (Dkt 50) ¶ 3.

[3]     Compl. (Dkt 1) ¶ 6.

Because the Government never filed an answer, the Court considers facts pertaining to Caceres's life, immigration history, and detention undisputed absent some contradiction in the Government's submissions.

[4]     *Id.* ¶ 33.

He lived with family in Long Island, New York, and worked various jobs to support himself and his family.[5]

According to the record, Caceres had no encounters with law enforcement until late 2009, when he was convicted of misdemeanor firearm possession under state law.[6]  By his account, that conviction stemmed from him having found a firearm in a bar and attempting to give it to a security guard.[7]  He was sentenced to only time served with a fine.[8]  Nevertheless, on December 16, 2009, an immigration judge ordered him removed to El Salvador, and he was deported on February 9, 2010.[9]

Caceres remained in El Salvador until 2013, but he faced escalating violence and persecution from rival gangs seeking to recruit him and from the police collaborating with at least one of those gangs.[10]  This culminated with him being dragged off a bus, beaten unconscious, tortured for twelve hours, and left for dead, only to be threatened further in the hospital upon his recovery by two

---

[5]     *Id.* ¶ 33.

[6]     Morrow Second Suppl. Decl. (Dkt 50) ¶ 4.

[7]     Compl. (Dkt 1) ¶ 34.

[8]     *Id.* ¶ 34.

[9]     Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 5-6.

[10]     Compl. (Dkt 1) ¶¶ 34-38.

4

of his attackers – both police officers.[11]  Fearing for his life and the safety of his family, he again fled El Salvador and illegally reentered the United States in 2013.[12]

Caceres returned to his family in Long Island and lived there for the next nine years.[13] By and large, he again lived a law-abiding life in the United States, working in roofing and siding and only receiving one non-criminal driving infraction, which resulted in a $200 fine.[14]  Yet, in September 2021, he was arrested for illegal reentry in violation of 8 U.S.C. § 1326(a).[15]  He pleaded guilty and was sentenced to time served on February 9, 2022.[16]  Around that time, he learned that the International Criminal Police Organization ("INTERPOL"), in 2019, had issued a notice relating to an outstanding arrest warrant in El Salvador for him with respect to his alleged connection to a decade-old, gang-affiliated murder.[17]  According to Caceres (and undisputed by the Government), the allegations underlying that warrant are false.[18]

---

[11] *Id.* ¶ 38.

[12] *Id.* ¶¶ 39-40; *see* Morrow Second Suppl. Decl. (Dkt 50) ¶ 7.

[13] Compl. (Dkt 1) ¶¶ 40-41.

[14] *See id.* ¶¶ 41-42.

[15] *Id.* ¶ 43.

[16] *Id.* ¶ 45; *see* Morrow Second Suppl. Decl. (Dkt 50) ¶ 9.

[17] Morrow Second Suppl. Decl. (Dkt 50) ¶ 8.

[18] Compl. (Dkt 1) ¶ 44.

II.    *Current ICE Detention*

Upon his release from criminal custody for the reentry charge, Caceres was transferred to ICE custody.[19]  Because he remained a noncitizen illegally present in the United States and previously was removed, ICE reinstated his prior order of removal and detained him for a period of ninety days, known as the "removal period."[20]  ICE was supposed to remove Caceres during that ninety-day period.[21]  But, because Caceres previously had been removed from the United States, ICE retained the discretion to detain him beyond the removal period pursuant to 8 U.S.C. § 1231(a)(6), which also authorizes ICE to release noncitizens like Caceres subject to appropriate terms of supervision.

Here, ICE was unable to deport Caceres within ninety days of reinstating his previous order of removal.  After being detained by ICE on February 11, 2022, Caceres expressed his fear of returning to El Salvador and received a reasonable fear interview,[22] in accordance with regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

---

[19]    *Id.* ¶ 46; *see* Morrow Second Suppl. Decl. (Dkt 50) ¶ 10.

[20]    Morrow Second Suppl. Decl. (Dkt 50) ¶ 11; *see* 8 U.S.C. § 1231(a)(2)(A) (mandating detention for noncitizens subject to final orders of removal for ninety days after entry of order of removal); *id.* § 1231(a)(5) (authorizing reinstatement of final order of removal against noncitizens previously removed pursuant to orders of removal).

[21]    8 U.S.C. § 1231(a)(1)(A).

[22]    Compl. (Dkt 1) ¶ 46; *see* 8 C.F.R. § 241.8(e) ("If an alien whose prior order of removal has been reinstated . . . expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture . . . .").

or Punishment ("CAT").[23] That interview occurred on February 28, 2022, and the interviewing asylum officer determined that Caceres had a reasonable fear of torture in El Salvador.[24] The officer accordingly referred Caceres's case to an immigration judge[25] before whom Caceres filed an application for withholding of removal.[26]

In accordance with 8 U.S.C. § 1231(b)(3) and regulations implementing CAT, a noncitizen may not be deported to a country in which his or her "life or freedom would be threatened in that country because of [his or her] race, religion, nationality, membership in a particular social group, or political opinion"[27] or in which "it is more likely than not that he or she would be tortured."[28] Withholding-only proceedings are "limited to a determination of whether the alien is eligible for withholding or deferral of removal."[29] Should a noncitizen be granted withholding-only relief, he or she may not be removed "to the country designated in the removal order unless the order

---

[23] Art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85.

[24] Morrow Second Suppl. Decl. (Dkt 50) ¶ 15.

[25] *See* 8 C.F.R. § 1208.31(e).

[26] Feb. 2, 2024 BIA Decision (Dkt 1-2) at 3; *see* Morrow Second Suppl. Decl. (Dkt 50) ¶ 15.

[27] 8 U.S.C. § 1231(b)(3).

[28] 8 C.F.R. § 1208.16(c)(2).

[29] 8 C.F.R. § 1208.2(c)(3)(i).

of withholding is terminated," but he or she nonetheless may be removed "to a third country other than the country to which removal has been withheld or deferred."[30]

On July 8, 2022, the immigration judge denied Caceres's withholding-only application.[31]  Caceres appealed that decision to the Board of Immigration Appeals ("BIA"), but it dismissed his appeal.[32]  He then appealed that dismissal to the Second Circuit, which, on November 21, 2023, stayed his removal pending appeal.[33]  His appeal before the Second Circuit remains pending.[34]

Additionally, Caceres sought to reopen in immigration court his application for withholding of removal on the ground that changed conditions in El Salvador warranted further evaluation of his eligibility for CAT protection.[35]  The BIA agreed on February 2, 2024, remanding his case to an immigration judge for further proceedings.[36]  This time, on September 3, 2024, the immigration judge granted Caceres's application for withholding of removal.[37]  It found that it was

---

[30]  *Johnson v. Guzman Chavez*, 594 U.S. 523, 531-32 (2021) (quoting 8 C.F.R. §§ 208.16(f), 1208.16(f)).

[31]  Morrow Second Suppl. Decl. (Dkt 50) ¶ 16.

[32]  *Id.* ¶ 17.

[33]  *Id.* ¶¶ 32-34.

[34]  *Id.* ¶ 39.

[35]  Feb. 2, 2024 BIA Decision (Dkt 1-2) at 3-4.

[36]  *Id.*; Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 18-19.

[37]  Morrow Second Suppl. Decl. (Dkt 50) ¶ 20.

more likely than not that Caceres would be tortured in El Salvador in light of expanded state targeting of suspected gang members in El Salvador and the outstanding Salvadoran arrest warrant – the warrant allegedly based on false allegations.[38]  ICE, however, appealed that decision, and the BIA again remanded the matter to immigration court in light of intervening decisions the BIA had issued in other cases.[39]  On February 5, 2026, an immigration judge held an individual merits hearing in Caceres's case regarding the likelihood that he would be tortured if he were deported to El Salvador.[40]  No decision yet has been issued; that case also remains pending.[41]

Despite these pending cases and a 2004 ICE internal policy directive, Directive 16004.1 – still in effect today – stating that it is ICE's "policy to favor release of aliens who have been granted protection relief by an immigration judge, absent exceptional concerns such as national security issues or danger to the community,"[42] Caceres has remained in ICE detention since February 11, 2022.[43]  Not only that, but ICE has shipped Caceres around the country, first from New York to

---

[38]   Compl. (Dkt 1) ¶ 49.

[39]   Sept. 29, 2025 BIA Decision (Dkt 34-1) at 2; Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 21, 26.

[40]   Rosner Decl. (Dkt 53) ¶ 9.

[41]   *See id.* ¶¶ 9-10.

[42]   Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 46-47.

[43]   *Id.* ¶ 10.

Mississippi, then to Louisiana, and finally back to New York.[44] Caceres furthermore claims that he

has been subjected to violence at the hands of jail staff and a lack of appropriate medical treatment

while detained.[45]

### III.    ICE's Review of Plaintiff's Ongoing Detention

Under 8 C.F.R. § 241.4, ICE must review periodically its decision to continue to

detain a noncitizen subject to a final order of removal.  Before the initial ninety-day removal period

expires,[46] ICE's "district director or the Director of the Detention and Removal Field Office having

jurisdiction over the alien" or one of their designees shall make the "initial custody determination"[47]

as to whether "to continue [the] alien in custody or grant release or parole" upon expiration of the

removal period.[48]  That determination "consist[s] of a review of the alien's records and any written

---

[44]

Compl. (Dkt 1) ¶ 52; Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 10, 12-14.

Deportation Officer William Morrow states that Caceres was detained at the Adams County Detention Center in Brighton, Colorado between July 25, 2022, and March 16, 2023. Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 12-13.  Caceres, however, states that he at that time was detained at the Adams County Correctional Center in Natchez, Mississippi. Compl. (Dkt 1) ¶ 52.  The Court takes judicial notice of the fact that ICE's public website reflects Adams County Correctional Center as being in Natchez, Mississippi, and listing no such detention facility in Brighton, Colorado.  *Detention Facilities*, ICE (Mar. 23, 2026), https://www.ice.gov/detention-facilities.

[45]

Compl. (Dkt 1) ¶ 55.

[46]

8 C.F.R. § 241.4(k)(1)(i).

[47]

*Id.* §§ 241.4(c)(1), (h)(1), (h)(5).

[48]

*Id.* § 241.4(a); *accord id.* § 241.4(k)(1)(i).

information submitted in English to the district director by or on behalf of the alien."[49] It may, but need not, include an interview with the noncitizen.[50] In conducting the review, the relevant ICE official must consider, among other factors, the noncitizen's behavior during detention, criminal history, mental health, rehabilitation, ties to the United States, immigration history, flight risk, and likelihood of being a danger to himself or herself or others.[51] The ICE official may release the noncitizen only if "the alien demonstrates . . . that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such alien's removal from the United States."[52] "A copy of any decision . . . to release or detain an alien shall be provided to the detained alien," and "[a] decision to retain custody shall briefly set forth the reasons for the continued detention."[53] A copy shall be provided also to a noncitizen's duly authorized attorney or representative of record.[54]

If the noncitizen remains detained after that first records review, ICE's Executive Associate Commissioner of the Headquarters Post-Order Detention Unit (the "Commissioner")[55] is

---

[49] *Id.* § 241.4(h)(1).

[50] *Id.* § 241.4(h)(1).

[51] *Id.* §§ 241.4(f), (h)(3).

[52] *Id.* § 241.4(d)(1).

[53] *Id.* § 241.4(d).

[54] *Id.* § 241.4(d)(3).

[55] *Id.* § 241.4(c)(2).

obliged to make another custody determination as to the noncitizen about three months after the removal period expires "or as soon thereafter as practicable."[56]   That determination requires convening a panel of ICE staff to make a recommendation to the Commissioner regarding continued detention after another review of the noncitizen's records.[57]   If the noncitizen remains detained after that second records review, the panel must interview the noncitizen, who may "submit . . . any information, in English, that he or she believes presents a basis for his or her release," and make another recommendation to the Commissioner.[58]   That recommendation shall be written and "include a brief statement of the factors that the Review Panel deem[ed] material to its recommendation."[59] The Commissioner ultimately must issue a custody determination based on the same factors listed above[60] and subsequently conduct custody reviews annually "or as soon as possible thereafter."[61] Additionally, every ninety days between annual reviews, a noncitizen "may submit a written request to the [Commissioner] for release consideration based on a proper showing of a material change in

---

[56]    *Id.* §§ 241.4(k)(2)(ii), 241.4(c)(2).

[57]    *Id.* § 241.4(i)(1)-(2).

[58]    *Id.* §§ 241.4(i)(3), (5).

[59]    *Id.* § 241.4(i)(5).

[60]    *Id.* § 241.4(i)(6).

[61]    *Id.* §§ 241.4(k)(2)(iii)-(iv).

12

circumstances since the last annual review.  The [Commissioner] shall respond to the alien's request in writing within approximately 90 days."[62]

Throughout Caceres's ongoing detention, it appears that ICE may have conducted *some but certainly not all* of the required periodic custody reviews.  It claims to have reviewed Caceres's custody status before the removal period ended and to have done so again every ninety days during his continued detention until August 8, 2023.[63]  ICE purports to have conducted each review pursuant to 8 C.F.R. § 241.4.[64]  And, each time, ICE determined that Caceres should remain detained.[65]

There is no evidence, however, that ICE followed the required procedures outlined above in conducting its custody reviews.  Neither the certified administrative record filed by the Government nor the declaration of Deportation Officer Morrow filed with its present motion for summary judgment contains any indication that ICE provided Caceres or his attorney with copies of its decisions to retain custody over him, let alone provided copies of decisions containing any reasoning.  Nor do the Government's materials contain any indication that the Commissioner convened a panel of ICE staff to make a recommendation regarding Caceres's continued detention around three months after the removal period expired.  Nor do they indicate that the panel interviewed Caceres and then made another recommendation to the Commissioner.  Nor do they

---

[62] *Id.* §§ 241.4(k)(2)(ii)-(iii).

[63] Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 40-45.

[64] *Id.*

[65] *Id.*

suggest that such a recommendation was in writing and explained the factors considered by the panel in reaching its recommendation.  Indeed, the only proof of the custody reviews is the say-so of Deportation Officer Morrow, whose declaration formulaically states that on the relevant date, "ICE conducted a . . . Post Order Custody Review, pursuant to 8 C.F.R. § 241.4 and determined that [Caceres] would remain in ICE custody."[66]

Furthermore, between August 8, 2023, and September 5, 2025, ICE admittedly failed to conduct any custody reviews on its own accord pursuant to 8 C.F.R. § 241.4.[67]  It says that its electronic scheduling system erred in registering Caceres's immigration status during the period from February 2, 2024, through August 28, 2025.[68]  It notes that it discovered this error on March 25, 2025,[69] but does not address why no custody review (which it claimed to have been conducting until then every ninety days) took place between August 8, 2023, and February 2, 2024, or why the error in its scheduling system took so long to correct.

On October 31, 2024 – in the middle of the roughly two years during which ICE undisputedly failed to conduct custody reviews for Caceres and after the immigration judge granted him withholding of removal – Caceres sought review of his custody yet again.[70]  ICE twice-over

---

[66]

*E.g.*, *id.* ¶ 40 ("On May 5, 2022, ICE conducted a 90-day Post Order Custody Review, pursuant to 8 C.F.R. § 241.4 and determined that [Caceres] would remain in ICE custody.").

[67]

*See id.* (Dkt 50) ¶¶ 45, 56.

[68]

*See id.* (Dkt 50) ¶¶ 52-55.

[69]

*Id.* (Dkt 50) ¶ 53.

[70]

*Id.* (Dkt 50) ¶ 48.

14

denied that request.  First, on November 22, 2024, it sent Caceres's counsel a one-page letter stating that although it had "carefully considered" Caceres's case and "all supporting documents that [he] provided in [his] release request" (of which there were approximately 400 pages), ICE lacked a "compelling reason to warrant a favorable exercise of discretion" to release Caceres.[71]  Second, on December 2, 2024, ICE sent Caceres a one-page letter stating that it had conducted a "thorough individualized review" of his custody status under Directive 16004.1 and that "[e]xceptional circumstances and/or a legal requirement to detain exists warranting this decision to maintain [Caceres] in ICE custody pending the outcome of the" withholding-only proceeding.[72]  ICE purports to have conducted those custody reviews, respectively, under 8 C.F.R. § 241.4(k)(2)(iii) and the aforementioned policy directive favoring the release of noncitizens granted withholding-only relief – Directive 16004.1.[73]  Both letters were signed by a deputy field office director (as opposed to the Commissioner), which ICE contends is in accord with Directive 16004.1, which states also that a field office director "must approve a decision to keep an alien granted protection relief in custody pending appeal."[74]

---

[71]  Certified Admin. R. (Dkt 44-13) at 399.

[72]  *Id.* at 400.

One understandably might question how "thorough" and "individualized" ICE's review of Caceres's custody status was given that ICE stated that an immigration judge had "granted [his] application for asylum."  *Id.*  That is not true.  Caceres was granted withholding of removal based upon his fear of torture in El Salvador.  He was not granted asylum in the United States.

[73]  Morrow Second Suppl. Decl. (Dkt 50) ¶¶ 49-50.

[74]  Certified Admin. R. (Dkt 44-1) at 017.

15

ICE in any event claims to have resumed conducting periodic custody reviews of Caceres's ongoing detention as of September 5, 2025, and promises to continue to do so "at least annually" moving forward.[75]  Unsurprisingly, in that September review, ICE again determined that Caceres would remain detained pending his removal.[76]  And, unsurprisingly, no evidence of that review exists in the record beyond Deportation Officer Morrow's say-so.

## IV.    Procedural Posture

Caceres brought this action on March 5, 2025.  The Government moved to dismiss for lack of personal jurisdiction and improper venue or, in the alternative, to transfer the action to the Western District of Louisiana, where Caceres then was detained.  The Court denied that motion, holding that (1) the district-of-confinement rule did not apply because Caceres's request for a bond hearing was not a core habeas challenge, and that (2) Caceres had made a *prima facie* showing that venue in this district was proper.

The Government then moved to dismiss for failure to state a claim upon which relief may be granted.  The Court denied that motion too, holding that Caceres had alleged a legally sufficient as-applied due process claim under the framework of *Mathews v. Eldridge*[77] and a legally sufficient Administrative Procedures Act ("APA") claim under *United States ex rel. Accardi v.*

---

[75]    Morrow Second Suppl. Decl. (Dkt 50) ¶ 57.

[76]    *Id.* ¶ 56.

[77]    424 U.S. 319 (1976).

16

*Shaughnessy.*[78]    The Court deemed waived for the purposes of that motion the Government's argument – made for the first on reply – that Caceres must allege extraordinary circumstances to bring an as-applied due process challenge to his detention.

## V.    *The Parties' Motions for Summary Judgment*

The Government now argues that this action should be dismissed on summary judgment because Caceres's detention without a bond hearing before a neutral arbiter is finite and does not present extraordinary circumstances and thus comports with due process, and because it reflects a reasonable exercise of discretion by ICE that accorded with its own policies.

Caceres maintains that his detention violates the Due Process Clause of the Fifth Amendment, at least in part due to the exceptionally prolonged length of his detention in jail-like conditions.  He argues also that ICE violated its own policies and thus the APA by failing to (1) review his continued detention and respond to his 2024 release request as required by applicable regulations, and (2) comply with its internal policy favoring the release of noncitizens granted withholding of removal because of fear-based claims.  He seeks a bond hearing before a neutral arbiter who is required to consider the availability of alternatives to detention and his ability to pay and in which the Government bears the burden to justify continued detention by clear and convincing evidence.  Caceres seeks also to set aside ICE's 2024 decisions to deny his release request.

---

[78]    347 U.S. 260 (1954).

17

### *Discussion*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[79]  Although the usual summary judgment standard does not apply where a party seeks review of agency action under the APA,[80] summary judgment nonetheless is appropriate when "the agency acted in excess of statutory authorization, not in accordance with law, arbitrarily and capriciously, or 'in some other way that violates 5 U.S.C. § 706.'"[81]  In reviewing whether the evidence "permitted the agency to make the decision it did,"[82] courts generally are "confined to the administrative record compiled by the agency when it made the decision."[83]

Mindful of the general principle that dispositive statutory arguments should be addressed before reaching constitutional claims,[84] the Court first addresses Caceres's APA claim.  It then addresses his due process claim before considering what relief, if any, is due.

---

[79] Fed. R. Civ. P. 56(a).

[80] *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 322, 344 (S.D.N.Y. 2015) (LAK).

[81] *New York v. DHS*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (quoting *Ass'n of Proprietary Colls.*, 107 F. Supp. 3d at 344).

[82] *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014).

[83] *Nat'l Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

[84] *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 160 n.2 (1979).  *But see Landor v. La. Dep't of Corr. and Pub. Safety*, No. 23-1197, 2026 WL 1791277, at *4 n.1 (U.S. June 23, 2026) (describing the principle of constitutional avoidance as a "prudential rule, not a mechanical one") (cleaned up).

18

## I.    APA Claim

Caceres's APA claim is narrow.  He seeks to set aside ICE's 2024 decisions denying his release request on the ground that it was error for a field office director (as opposed to the Commissioner) to make those decisions on behalf of ICE.  He contends also that ICE failed to follow Directive 16004.1 in making those decisions.  The Government responds that Directive 16004.1 itself authorized a field office director to make those decisions and that ICE's decisions "were not so implausible that [they] could not be ascribed to a difference in view" of what Directive 16004.1 demanded with respect to favoring the release of noncitizens granted withholding of removal.[85]

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."[86]  The scope of review is constrained.  The agency must have "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or reached a decision that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[87]  In making that decision, however, the agency must have followed its own policies and procedures.[88]

---

[85]

Gov't's Mot. (Dkt 51) at 21.

[86]

5 U.S.C. §§ 706(2)(A), (D).

[87]

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44 (1983).

[88]

*Accardi*, 347 U.S. at 267-68; *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

19

This requirement "is not limited to rules attaining the status of formal regulations."[89]   Nor is a showing of prejudice required when the rule at issue exists "to protect a fundamental right derived from the Constitution or a federal statute, and the [agency] fails to adhere to it."[90]

Here, it is apparent (and undisputed) that the regulatory requirement that the Commissioner make continued detention determinations beginning approximately ninety days after the removal period expires and the internal policy directive favoring the release of noncitizens granted withholding of removal exist to protect the liberty of noncitizens from prolonged and unnecessary detention.  It is apparent also that ICE failed to follow at least the regulatory requirement that the Commissioner make continued detention determinations.  On this point, however, the Government disagrees.  It notes that Directive 16004.1 calls for "responsibility for the post-order custody review [to] shift[] from [the Commissioner] to the Field Office Director" where, as here, "a stay of removal is in place."[91]   But that internal policy directive directly contradicts 8 C.F.R. § 241.4(c)(2), which expressly delegates to the Commissioner the statutory authority to make custody determinations for "any alien who has not been released or removed by the expiration of the three-month period after the review." No matter how "longstanding" ICE's practice of delegating such decisions to field office directors may be,[92] doing so cannot be a valid act of discretion while 8 C.F.R. § 241.4(c)(2) remains

---

[89]    *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991).

[90]    *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1993).

[91]    Gov't's Mot. (Dkt 51) at 21 n.12.

[92]    *See id*.

20

operative.[93]  Holding otherwise would defeat the whole point of requiring agencies to follow their own regulations.

With respect to whether ICE followed the portion of Directive 16004.1 favoring the release of noncitizens granted withholding of removal, the Government argues that ICE "reasonably concluded . . . that exceptional circumstances exist[ed,] warranting maintaining detention."[94]  The Government suggests that ICE's decision to maintain detention was based on Caceres's "undisputed criminal history."[95]  It is impossible, however, to evaluate the veracity of that claim and thus the reasonableness of ICE's decision and its compliance with its internal policy directive because ICE declined to provide any reasoning or explanation in its December 2, 2024 decision that purportedly was reached under Directive 16004.1.[96]  ICE did not address any individualized facts as to Caceres, let alone his criminal history, in its written decision.

In any case, regardless of whether ICE complied with Directive 16004.1, it is sufficient for purposes of these motions to find that ICE violated 8 C.F.R. § 241.4 when it denied Caceres's

---

[93]

> *See United States v. Nixon*, 418 U.S. 683, 694 (1974) ("So long as this regulation is extant it has the force of law."); *Nat'l Fam. Planning and Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked.").

[94]

> Gov't's Mot. (Dkt 51) at 22.

[95]

> Gov't's Reply (Dkt 55) at 10.

[96]

> *See* Certified Admin. R. (Dkt 44-13) at 400.

21

2024 release request.  Caceres therefore is entitled to the process that was due under that regulation[97] – i.e., a review of his release request *conducted by the Commissioner*.

The Government is incorrect in claiming that Caceres's APA claim is mooted by his having received the September 5, 2025 custody review.  There is no indication that the Commissioner (as opposed to a field office director) made the decision to continue detaining Caceres after that review.  Rather, based on the Government's insistence that it is longstanding ICE policy for a field office director instead to make that determination, it appears undisputed that ICE continued to violate 8 C.F.R. § 241.4 in its September 5, 2025 custody review.  Because the regulation requiring review by the Commissioner was promulgated to protect detained noncitizens' fundamental right to liberty and because ICE failed to adhere to it, the Court grants summary judgment to Caceres on his APA claim and invalidates ICE's denial of his 2024 release request.[98]

## II.    *Due Process Claim*

Despite finding that Caceres is entitled to the relief he seeks on his APA claim, the Court now must address his due process claim.  That is so because, as the Government correctly argues, his APA claim cannot entitle him to the bond hearing that he seeks.  Only his due process claim could warrant such relief.

With respect to Caceres's due process claim, the Government argues that his detention is governed by Section 1231(a)(6), which does not provide detainees with a statutory right to periodic

---

[97] *See Accardi*, 347 U.S. at 268 (stating that petitioner should receive prescribed process if he proves claim on remand).

[98] *See Waldron*, 17 F.3d at 518.

22

bond hearings.  The Government claims also that, under *Zadvydas v. Davis*,[99] as long as Caceres's detention remains reasonably foreseeable, he is not entitled to a bond hearing or any court-imposed process beyond that which ICE has chosen to provide.

Caceres does not dispute that he is detained pursuant to Section 1231(a)(6) and that he lacks a statutory right to a bond hearing.  Nor could he.  The Supreme Court in recent years has established conclusively both of these points.[100]  Nor does Caceres advance a due process challenge under the framework of *Zadvydas*.  He nonetheless maintains that due process entitles him to a bond hearing because of the prolonged length of his detention and the lack of process that he has received.

The Court first determines whether the *Zadvydas* framework and subsequent precedent precludes Caceres's as-applied due process challenge and, if not, then analyzes what additional or substitute procedures, if any, are due to him.

### A.    Availability of As-Applied Due Process Challenge

In *Zadvydas*, the Supreme Court read into the text of Section 1231(a)(6) a limit on the length of detention authorized by the statute.  Notwithstanding the lack of statutory language saying as much (or anything of the sort), the Court held that "the statute, read in light of the

---

[99]    533 U.S. 678 (2001).

[100]    *Johnson v. Guzman Chavez*, 594 U.S. 523, 526 (2021) (Section 1231 "governs the detention of aliens subject to reinstated orders of removal, meaning those aliens are not entitled to a bond hearing while they pursue withholding of removal."); *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 576 (2022) (Section 1231(a)(6) does not require "the Government to offer detained noncitizens bond hearings after six months of detention in which the Government bears the burden of proving by clear and convincing evidence that a noncitizen poses a flight risk or a danger to the community.").

Constitution's demands, limits an alien's post-removal period detention to a period reasonably necessary to bring about that alien's removal from the United States."[101]  It set six months as a benchmark for a presumptively reasonable period in which the Government could keep noncitizens detained under Section 1231(a)(6).[102]  After that point, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."[103]  The holding in *Zadvydas* thus was a statutory holding.  But it was a statutory holding explicitly reached on constitutional avoidance grounds.[104]  In other words, the Supreme Court read in the statutory limit it did because *that* was the limit it determined that due process set regarding prolonged detention under Section 1231(a)(6).

This Court accordingly agrees with the Government (and courts of appeals decisions relied upon by the Government) that *Zadvydas*, though a statutory case, provides the appropriate framework for addressing due process challenges to prolonged detention under Section 1231(a)(6) in *most* cases.[105]  And the Court disagrees with Caceres (and the district court decisions to which he

---

[101]  *Zadvydas*, 533 U.S. at 689; *see Guzman Chavez*, 594 U.S. at 529.

[102]  *Zadvydas*, 533 U.S. at 701.

[103]  *Id.*

[104]  *Id.* at 689.

[105]  *Castaneda v. Perry*, 95 F.4th 750, 760 (4th Cir. 2024) ("*Zadvydas* largely, if not entirely, forecloses due process challenges to § 1231 detention apart from the framework it established."); *Martinez v. Larose*, 968 F.3d 555, 564-66 (6th Cir. 2020) (evaluating petitioner's due process claim under the framework of *Zadvydas*); *see Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003) ("Because the *Zadvydas* Court set forth this 'reasonable

24

cites) that as-applied due process claims adjudicated outside of the *Zadvydas* framework always may be brought if a noncitizen has been detained under Section 1231(a)(6) for longer than six months.[106] The *Zadvydas* framework *is the due process framework* for cases in which a noncitizen detained pursuant to Section 1231(a)(6) challenges only the length of his or her detention.

That is not to say, however, that due process *never* can demand more procedure with respect to noncitizens detained pursuant to Section 1231(a)(6). At least as of now, "as-applied constitutional challenges . . . to address exceptional cases" remain available.[107] The Government, as

---

foreseeability' test in order to prevent § 241 from violating the Due Process Clause, we may safely assume that this test articulates the outer bounds of the Government's ability to detain aliens . . . without jeopardizing their due process rights."), *superseded by statute on other grounds*, 8 U.S.C. § 1252(a)(4).

The First Circuit, in *G.P. v. Garland*, addressed only the petitioner's statutory claim under Section 1231(a)(6). 103 F.4th 898, 902 n.3 (1st Cir. 2024). It did not have before it a constitutional claim. *Id.*

[106] *See Michelin v. Oddo*, No. 23-cv-22, 2023 WL 5044929, at *5 (W.D. Pa. Aug. 8, 2023) ("[N]oncitizens detained under § 1231(a)(6) past the *Zadvydas* six-month presumptively constitutional period may bring an as-applied due process challenge to his or her detention under the statute."); *Juarez v. Choate*, No. 24-cv-419, 2024 WL 1012912, at *5 (D. Colo. Mar. 8, 2024) (same); *Ramirez v. Bondi*, No. 25-cv-1002, 2025 WL 1294919, at *5 (D. Colo. May 5, 2025) (same); *Arostegui-Maldonado v. Baltazer*, 794 F. Supp. 3d 926, 938 (D. Colo. 2025) ("[A]s-applied constitutional challenges to prolonged detention are separate and distinct from the statutory prohibition against indefinite detention embodied in *Zadvydas*."); *see also Cabrera Galdamez v. Mayorkas*, No. 22-cv-9847, 2023 WL 1777310, at *4 (S.D.N.Y. Feb. 6, 2023) (applying *Mathews* balancing test without first addressing *Zadvydas*); *Cruz v. Bondi*, No. 25-cv-262, 2025 WL 3295485, at *5 (D.R.I. Nov. 26, 2025) ("Recognizing that other courts have analyzed [claims under *Zadvydas* and the Due Process Clause] separately, this Court will do the same.").

[107] *Arteaga-Martinez*, 596 U.S. at 583 (leaving such claims "for the lower courts to consider in the first instance") (internal quotation marks omitted); *Black v. Decker*, 103 F.4th 133, 148 n.19 (2d Cir. 2024) ("*Arteaga-Martinez* . . . said nothing about the applicability of the *Mathews* framework to a *constitutional* challenge to prolonged detention under section 1231(a)(6) . . . ."), *cert. granted sub nom.*, *Genalo v. Black*, No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026); *see Castenada*, 95 F.4th at 761 (assuming without deciding "that as-applied due process challenges to § 1231 detentions may proceed outside the *Zadvydas*

of a few years ago, agreed.[108]  Though the Government's position now seems to have changed, it

nonetheless recognizes that, in addition to the demands of *Zadvydas*, due process for noncitizens

detained pursuant to Section 1231(a)(6) requires at a minimum compliance with applicable

regulations.[109]  Indeed, ICE's purported adherence to applicable regulations is a large part of why the

Government here argues that "this is not the 'exceptional' case that warrants an as-applied

challenge."[110]  In the abstract, the Government's position is not without some appeal.  The applicable

regulations in theory would provide a detained noncitizen with periodic reviews of his or her custody

status by various ICE officials, including those at high levels of the agency.  One could imagine those

reviews being rigorous, detailed, and meaningful if they were conducted as written in the regulations,

notwithstanding that they still would be conducted by the same agency that chose to continue

detaining the noncitizen in the first instance.[111]  But the facts of this case dispel that notion.  As

---

framework when the alien presents, as a threshold matter, exceptional circumstances warranting that departure").

[108]  Brief for Pet'rs at 21, *Arteaga-Martinez*, 596 U.S. 573 (No. 19-896), 2021 WL 4865264, at *21 ("In short, existing regulations provide – at least as a general matter – all the process that the Constitution requires.  To the extent exceptional cases arise, courts could consider as-applied constitutional challenges to continued detention under Section 1231(a)(6).").

[109]  *See* Gov't's Mot. (Dkt 51) at 13 ("[F]or aliens in withholding-only proceedings, due process does not require more than the periodic post-order custody reviews provided for by regulation . . . .").

[110]  *See id.* at 14 (arguing that there has been no showing of bad faith on the part of the Government and that Caceres "has received ample process through periodic post-order custody reviews").

[111]  *See Zadvydas*, 533 U.S. at 692 (noting "that the Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights'") (quoting *Superintendent, Mass Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 450 (1985)).

26

Caceres argues, even if this Court recognizes the need for a case to present exceptional circumstances to warrant being evaluated outside the *Zadvydas* framework – which it does – this case would clear the bar "given his four years of detention and the severe lack of process he has been afforded since his detention began."[112]

The Court therefore need not and does not attempt to define with particularity here what could constitute exceptional circumstances in every case to warrant an as-applied due process challenge. That determination appropriately is a case-by-case, fact-specific one. It suffices for purposes of these motions and this case to find that ICE's failure to follow its own regulations and provide any semblance of meaningful review of Caceres's detention for over four years and almost five months is exceptional and warrants adjudicating his due process claim outside the *Zadvydas* framework. As detailed above, there is no evidence that ICE reviewed Caceres's ongoing detention at the levels of the agency that are mandated by the regulations. Nor is there evidence that whoever made the decisions to continue detaining Caceres considered the factors required under the regulations and gave them appropriate weight in reaching the repeated decisions to detain. And, by ICE's own account, it failed to conduct *any* sort of custody review on its own accord for over two years. In the midst of that failure, the most it could muster in response to Caceres's 2024 release request was two one-page letters, one of which contained a basic factual inaccuracy regarding Caceres's immigration case and neither of which contained any discussion of the facts and circumstances supposedly justifying Caceres's ongoing detention. Because ICE could not be bothered to explain its reasoning to Caceres or this Court, the only conclusion the Court can draw

---

[112] Pl.'s Mot. (Dkt 54) at 11.

is that the periodic custody reviews ICE conducted were *pro forma* and likely constituted insufficient process to justify depriving Caceres of his liberty for well over four years.

This conclusion readily distinguishes this case from *Castaneda v. Perry* in which the Fourth Circuit concluded that the petitioner failed to present exceptional circumstances warranting an as-applied constitutional challenge outside the *Zadvydas* framework.[113]  The Fourth Circuit there found that "the record demonstrates that [the petitioner] has received ample process since his detention began in 2019," consisting of a bond hearing before an immigration judge and "numerous custody reviews by ICE."[114]  "Nothing in the current record" led the Fourth Circuit "to question those determinations."[115]  Unlike the Fourth Circuit in *Castaneda*, the Court here cannot take comfort in the processes ICE provided to the detained noncitizen.  And the same distinction exists with respect to cases on which the Government relies arising out of this Circuit or district.[116]

B.    *Additional or Substitute Procedures*

To determine whether Caceres indeed is entitled to further process and, if so, to determine what that process is, the Court is guided by the Second Circuit's decisions in *Velasco*

---

[113]

95 F.4th at 761.

[114]

*Id.* at 761-62.

[115]

*Id.* at 762.

[116]

*See Wang*, 320 F.3d at 138 (describing an immigration officer's written decision laying out reasons for why petitioner should not be released from custody); *Portillo v. Decker*, No. 21-cv-9506, 2022 WL 826941, at *7 (S.D.N.Y. Mar. 18, 2022) ("[T]o the extent [the petitioner] suggests that the statutory and regulatory framework at issue has been errantly applied to him, on the record before the Court, there is no factual basis to so assert.").

28

*Lopez v. Decker*[117] and *Black v. Decker*.[118]  In the former, the Second Circuit considered whether noncitizens subject to discretionary detention before entry of a final removal order under 8 U.S.C. § 1226(a) at some point are entitled to a bond hearing at which the Government must justify continued detention by clear and convincing evidence.[119]  In the latter, the Second Circuit addressed the same question with respect to noncitizens subject to mandatory detention before entry of a final removal order under 8 U.S.C. § 1226(c).[120]  In both instances,[121] the Second Circuit employed the three-factor balancing test as provided in *Mathews v. Eldrige*.[122]  The *Mathews* framework is the appropriate test by which to evaluate Caceres's as-applied due process claim for the same reasons the Second Circuit found it "apt" in *Velasco Lopez* and *Black*.[123]

"Under *Mathews*, courts evaluate three factors to determine whether an official action poses due process concerns, making additional procedural protections necessary."[124]  The three factors are (1) "the private interest that will be affected by the official action," (2) "the risk of an

---

[117]

978 F.3d 842 (2d Cir. 2020).

[118]

103 F.4th 133 (2d Cir. 2024).

[119]

*Velasco Lopez*, 978 F.3d at 845-46.

[120]

*Black*, 103 F.4th at 137-38.

[121]

*Velasco Lopez*, 978 F.3d at 851; *Black*, 103 F.4th at 147.

[122]

424 U.S. 319 (1976).

[123]

*See Black,* 103 F.4th at 147-48 (describing *Mathews* framework's basis in relevant precedent and its doctrinal flexibility and adaptability).

[124]

*Caceres v. Joyce*, 813 F. Supp. 3d 407, 416 (S.D.N.Y. 2025) (LAK).

29

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[125]

Here, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment."[126] "The longer the duration of incarceration, the greater the deprivation."[127] Caceres has been detained for close to fifty-three months, or approximately 1,600 days. That is over *seventeen times* the standard ninety-day removal period and close to *nine times* the presumptively reasonable limit to post-removal detention under Section 1231(a)(6). The deprivation that Caceres has experienced "was not the result of a criminal adjudication."[128] Nevertheless, he has been subject to unquestionably harsh conditions,[129] even setting aside his allegations of abuse and lack of medical treatment. He has been taken away from his family, including his two young daughters, and moved around the country at the Government's whim. Additionally, his immigration cases remain pending and could be subject to further appeals. Neither

---

[125]    *Mathews*, 424 U.S. at 335.

[126]    *Velasco Lopez*, 978 F.3d at 851.

[127]    *Id.* at 852.

[128]    *Id.* at 851.

[129]    *Id.* at 851-52 ("The deprivation he experienced while incarcerated was, on any calculus, substantial. He was locked up in jail. He could not maintain employment or see his family or friends or others outside normal visiting hours. The use of a cell phone was prohibited, and he had no access to the internet or email and limited access to the telephone."); *Black*, 103 F.4th at 151.

30

party has provided any estimate of when his cases might conclude and when he might be removed from the country and thus freed from detention. The first *Mathews* factor weighs heavily in Caceres's favor.[130]

As for the second *Mathews* factor – the risk of an erroneous deprivation of the interest at stake – courts evaluate "the risk of error inherent in the [existing] truth-finding process," absent any additional or substitute procedural safeguards.[131] Here, the risk of ICE erroneously determining that Caceres should remain detained (or failing even to evaluate whether he should remain detained) has been intolerably high. As described by another court in this district, the existing processes – even if followed as written – would suffer from at least three significant shortcomings from a due process perspective. "First, the regulations place the burden on [Caceres] rather than the Government. Second, the decision is by ICE itself, not an outside arbiter such as an immigration judge. Finally, the regulations do not provide for an in-person hearing, where [Caceres could] present his argument, call witnesses and confront the Government's evidence."[132] And that assumes that the processes actually play out as written. Yet, without providing for any sort of judicial review or appeals process, there is no check to ensure that the existing processes operate as intended. Indeed, here the existing

---

[130]

The Government's invocation of *Bhaktibhai -Patel v. Garland*, 32 F.4th 180 (2d Cir. 2022) is beside the point. There, the Second Circuit held that noncitizens subject to final orders of removal cannot bring judicially cognizable due process claims in the context of withholding-only proceedings because such relief is discretionary and the provided-for procedures are constitutionally sufficient. *Id.* at 198-99. The Second Circuit there simply did not address a noncitizen's liberty interest in being free from prolonged detention without meaningful review during his or her withholding-only proceedings.

[131]

*Velasco Lopez*, 978 F.3d at 852.

[132]

*Cabrera Galdamez*, 2023 WL 1777310, at *6.

31

processes have failed to result in a meaningful review of Caceres's continued detention over a period of over four years and five months.

Based on the limited record, it moreover appears that Caceres, upon his release subject to appropriate terms of supervision, neither would pose a risk to the community nor be unlikely to comply with the order of removal.[133]  He has lived by and large a law-abiding life in the United States. Apart from his conviction for illegal reentry, he has been convicted of only one crime – a misdemeanor at that – over fifteen years ago.[134]  He has strong family ties in Long Island and actively is litigating his claim for withholding in immigration court.

In the absence of any meaningful review of Caceres's ongoing detention having occurred thus far, just about any additional procedural safeguards would be of value here.[135]  "The most obvious of these—and that sought by [Caceres]—would be an individualized bond hearing at which an [immigration judge] can consider [his] dangerousness and risk of flight."[136]  The second *Mathews* factor therefore weighs heavily in Caceres's favor as well.

With respect to the third *Mathews* factor, as with other immigration enforcement statutes, the Government has two primary legitimate and important interests in support of unlimited

---

[133]  *See Velasco Lopez*, 978 F.3d at 853; *Black*, 103 F.4th at 153.

[134]  *See Cabrera Galdamez*, 2023 WL 1777310 at *6 ("[T]he mere fact of his unlawful entry into the United States with a subsequent removal order and his single criminal case from thirteen years ago that resulted in a misdemeanor conviction may not be sufficient to substantiate that Petitioner poses a risk of flight or danger to the community.").

[135]  *See Black*, 103 F.4th at 153.

[136]  *Id.*

discretionary detention. They are "ensuring that noncitizen[s] do not abscond"[137] and "protecting the community from noncitizens who have been involved in crimes [or conduct] that Congress has determined differentiate them from others."[138] The Government no doubt maintains also an interest in retaining a level of discretion to detain certain noncitizens without affording them extensive, individualized procedure. Nevertheless, the Government cannot have an interest "in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight."[139] And "shifting the burden of proof to the Government to justify continued detention promotes the Government's interest . . . in minimizing the enormous impact of incarceration in cases where it serves no purpose."[140] Nor is the public interest served by unnecessary detention. "[I]t separates families[,] removes from the community breadwinners, caregivers, parents, siblings, and employees,"[141] costs taxpayer dollars, and drains other public resources.[142] Though providing an individualized bond hearing in which the Government bears the burden would cost resources in its own right, the Court, like the Second Circuit in *Black*, expects that those costs likely would "be outweighed by costs saved by reducing

---

[137] *Velasco Lopez*, 978 F.3d at 854.

[138] *Black*, 103 F.4th at 153.

[139] *Velasco Lopez*, 978 F.3d at 854; *Black*, 103 F.4th at 154.

[140] *Velasco Lopez*, 978 F.3d at 854; *Black*, 103 F.4th at 154.

[141] *Velasco Lopez*, 978 F.3d at 855; *accord Black*, 103 F.4th at 154.

[142] *See Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018).

unnecessary detention."[143]  The third *Mathews* factor, while more nuanced, nonetheless still weighs in Caceres's favor.

In sum, due process entitles Caceres to an individualized bond hearing before an immigration judge.[144]  At that bond hearing, the Government shall bear the burden to justify by clear and convincing evidence that Caceres, upon release subject to appropriate terms of supervision, would pose a risk of flight or a danger to the community.  In setting his bond, the immigration judge furthermore must consider Caceres's ability to pay and any alternative means of assuring his appearance.  The Court is persuaded that these specific procedures are required to avoid the risk of erroneously depriving Caceres of his liberty for substantially the same reasons as the Second Circuit held them necessary in *Black*.  The shifted burden is necessary in light of the difficulties that Caceres likely will encounter in preparing his case and in attempting to prove a negative – i.e., that he is "*not* a danger and *not* a flight risk."[145]  The difficulties Caceres will face likely will be even greater than those faced by the petitioners in *Black* given how much longer than them Caceres has been detained.[146]  The standard of clear and convincing evidence is justified because it is rooted firmly in

---

[143]    103 F.4th at 154-55.

[144]    Caceres argues on reply that this Court (as opposed to an immigration court) should conduct the bond hearing.  The Court declines to consider this issue at least in part because Caceres raised it for the first time in his reply brief.  *See In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006).

[145]    *Black*, 103 F.4th at 155-56.

[146]    *See id.* at 137 (seven months and twenty-one months there versus almost fifty-three months here).

precedent.[147]   And requiring that the immigration judge consider alternatives to detention and Caceres's ability to pay merely ensures that "*some* weight is given" to appropriate factors related to the Government's "legitimate interests in protecting the public and in ensuring that noncitizens appear for their removal proceedings."[148]   Given ICE's apparent lack of consideration of these factors or, for that matter, any factors (at least ones that it chose to explain) until this point in Caceres's detention, this level of guidance is all the more appropriate.   Contrary to the Government's argument otherwise, it does nothing to constrain the immigration judge's discretion.[149]

### *Conclusion*

For the foregoing reasons, the Government's motion for summary judgment (Dkt 49) is **DENIED**.   Caceres's cross-motion for summary judgment (Dkt 52) is **GRANTED**.   The Government is hereby **ORDERED**, no later than July 10, 2026, to (1) provide Caceres with a bond hearing before an immigration judge, or (2) release him in the Southern District of New York with all property taken from him at or after his detention, subject to any appropriate terms of supervision as authorized by 8 U.S.C. § 1231(a)(3).

At the bond hearing, assuming that it is held, the Government shall bear the burden of demonstrating by clear and convincing evidence that Caceres, upon release subject to appropriate terms of supervision as authorized by Section 1231(a)(3), would pose a risk of flight or a danger to

---

[147]   *Id.* at 157-58; *Velasco Lopez*, 978 F.3d at 856-57.

[148]   *Black*, 103 F.4th at 158-59.

[149]   *Id.* at 159.

35

the community.  If the Government fails to establish by clear and convincing evidence at least one of those two criteria for continued detention, it shall immediately release Caceres in the Southern District of New York with all property taken from him at or after his detention, subject to any appropriate terms of supervision as authorized by Section 1231(a)(3).  Additionally, the Government may not invoke an automatic stay under 8 C.F.R. § 1003.19(i)(2) if the immigration judge grants Caceres bond.[150]

The Government, no later than July 11, 2026, shall file a letter confirming that the bond hearing was held and stating its outcome or confirming that Caceres was released and stating on what conditions of supervision, if any, he was released.

SO ORDERED.

Dated:       July 1, 2026
Issued at:   10:29 a.m.

Lewis A. Kaplan
United States District Judge

---

[150] The Government in its reply brief declined to respond to Caceres's argument requesting this relief, so the Court deems the argument forfeited. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004); *Bruni v. City of Pittsburgh*, 941 F.3d 73, 84 n.11 (3d Cir. 2019); *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, 90 F.4th 217, 234 (4th Cir. 2024); *Gilley v. Protective Life Ins. Co.*, 17 F.3d 775, 781 n.13 (5th Cir. 1994); *Jackson v. USPS*, 149 F.4th 656, 670 (6th Cir. 2025).